# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

FILED

98 NOV 30 PH 3: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| BERTHA LELIA MADISON, | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| vs. | ] |
| | ] |
| NORTHPORT HEALTH SERVICES, | ] |
| INC., | ] |
| | ] |
| Defendant. | ] |

CV 97-N-0505-W

**ENTERED**

**NOV 3 0 1998**

## Memorandum of Opinion

In this action, plaintiff Bertha Lelia Madison brings suit pursuant to Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in

Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, alleging that defendant Northport Health

Services (hereinafter "Northport") discriminated against her in the terms and conditions of

her employment on the basis of her sex and age and retaliated against her for engaging in

an activity protected by Title VII.[1] Specifically, she alleges that she was terminated from her

position as Administrator at Northport's Moundville, Alabama site and replaced by male

persons who were significantly younger than her, at least in part in retaliation for an earlier

complaint.

---

[1] The plaintiff included in her complaint a claim that she was subjected to a sexually hostile work
environment while employed by the defendant. She has since wisely chosen not to pursue that claim. *See
Opponent's Statement of Facts in Response to Exhibit D of the Court's Order* at ¶ 137. The evidence suggests
that this claim was always the proverbial mountain growing from the proverbial molehill. Why a party assigned
the burden of proof in litigation would needlessly complicate the case by inserting in it questionable claims is
simply beyond the understanding of this "ole country lawyer" who was taught long ago by a shrewd older "country
lawyer" the wisdom of Abraham Lincoln who once wrote, "In law it is good policy to never plead what you need
not, lest you oblige yourself to prove what you can not."

The matter is presently before the court on a motion for summary judgment filed by Northport on July 16, 1998. The motion has been fully briefed and was submitted at the court's regularly scheduled motion docket on Wednesday, September 30, 1998. Upon due consideration, defendant's motion for summary judgment will be granted in all respects.

## I.   Statement of Facts.[2]

Plaintiff Bertha L. Madison is a female white citizen of the United States (*Madison Decl.* at 1). She was born on October 2, 1940 (*Madison Depo.* at 8). She began her employment at Moundville Nursing Home (hereinafter "Moundville" or "Moundville facility") on November 14, 1983 (*Id.* at 16), in the position of bookkeeper (*Id.* at 17). Plaintiff remained the bookkeeper at Moundville until February of 1986 (*Id.* at 18). During this period at the bookkeeper, Ms. Madison was not disciplined by her employer (*Id.* at 18-19).

In February of 1986, the plaintiff left Moundville for a job as Administrator at the East Haven Nursing Home (hereinafter "East Haven")(*Id.* at 19). East Haven is located in Birmingham and houses approximately 60 to 65 residents (*Id.* at 19, 21). She remained employed by East Haven until May or June of 1986 (*Id.* at 22). She was not disciplined during her employment with East Haven and her resignation was voluntary (*Id.* at 23).

Ms. Madison returned to Moundville as an Administrator on June 6, 1986 (*Id.* at 26). At the time, it was owned and operated by another company, Maxi-Care Centers (*Id.* at 24).

---

[2] In developing the statement of facts in this opinion, the court considered those facts claimed to be undisputed by the parties, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

Defendant Northport acquired the Moundville facility during August of 1986 (*Id.* at 27), when the plaintiff was approximately 45 years of age (*Id.* at 8, 27).

On or about February of 1991, plaintiff was asked to transfer from the Moundville facility to Glenn Haven Nursing Facility (hereinafter "Glenn Haven" or "Glenn Haven facility"), another nursing home owned by Defendant, to serve as Administrator. (*Id.* at 30). The Glenn Haven Facility is located approximately fourteen (14) to fifteen (15) miles from the Moundville facility (*Id.* at 32). At that time the Glenn Haven Facility had approximately 160 residents in the long term care portion of the facility (*Id.* at 35). In addition, there was a separate "retirement center," similar to an assisted living facility, which housed approximately 25 residents (*Id.* at 35, 45-46, 48). Her new position carried with it an increase in pay. (*Id.* at 45). She was then approximately 50 years of age (*Id.* at 8).

When the plaintiff transferred to Glenn Haven, John Hankins served as Vice President of Operations for Defendant (*Id.* at 29, 31). Hankins recommended the plaintiff for the Administrator position at Glenn Haven, and Norman Estes approved her transfer to that facility (*Estes Depo.* at 110). Estes testified that he felt that Madison had achieved good success at Moundville and he thought she should be given a shot at the larger Glen Haven facility (*Id.*). Plaintiff's immediate supervisor during this period was April Prucetti, a Regional Administrator (*Madison Depo.* at 39). Prucetti reported to Hankins (*Id.*).

According to plaintiff, she was asked to transfer to the Glenn Haven Facility in order to straighten out some problems at that facility (*Id.* at 53). One of the problems plaintiff identified when she arrived at Glenn Haven was staffing problems that were arising due to "call-ins" (*Id.* at 64). In an effort to correct the call-in problem, plaintiff stated she changed

3

the manner in which the work schedule was organized (*Id.* at 65-66). At the time plaintiff arrived, one schedule existed for all three of the facility's nursing stations and was coordinated by the Director of Nursing (hereinafter "DON") (*Id.* at 65-66, 85). Plaintiff changed the system by placing one registered nurse (hereinafter "RN") in charge of each of the three nursing stations and giving an RN responsibility for staffing at each station. (*Id.*).

While plaintiff was at Glenn Haven, several RNs and Licensed Practical Nurses (hereinafter "LPNs") traveled to the corporate office to meet with Norman Estes (*Id.* at 83; *Estes Depo.* at 115). When they arrived, Mr. Estes asked the nurses if their Administrator, the plaintiff, and DON were aware that they were meeting with him (*Estes Depo.* at 116). The nurses responded that the DON had informed them that it was okay to meet with him (*Id.*). The nurses proceeded to tell Norman Estes about their concerns regarding the manner in which the plaintiff was managing the facility and dealing with personnel at the facility (*Id.* at 118-19, 122). The issues discussed with Norman Estes included the plaintiff's decision to change the method of scheduling from the responsibility of the administrative nursing staff (the DON) to the floor nurses; morale problems resulting from numerous terminations by the plaintiff and the resulting fears as to job security; patient care concerns due to employee turnover; and the plaintiff's management style (*Id.*).

Following this meeting, Estes traveled to Glenn Haven and met with employees to further discuss their concerns (*Id.* at 119-20). Estes thereafter met with the plaintiff to discuss both his meeting with the nursing employees in his office and his meeting with employees at the facility (*Madison Depo.* at 83-86; *Estes Depo.* at 124). Estes did not ask plaintiff to change the method she had implemented for organizing staffing at the nursing

4

stations and the organizational structure remained the same throughout plaintiff's tenure at Glenn Haven (*Madison Depo.* at 87-88). Estes testified that he "wanted to discount some of the complaints to, you know, change. Any time there is a change, there is a certain amount of unrest" (*Estes Depo.* at 118-19).

Plaintiff testified that while at Glenn Haven Norman Estes never suggested that she discipline someone she did not want to discipline and that no superior ever prevented her from disciplining someone she wanted to discipline (*Madison Depo.* at 82, 88). She also testified that there was never an occasion on which she wanted to change some aspect of the operation of the facility that a regional administrator prevented or restricted (*Id.* at 93-94). She testified that Hankins wanted her to terminate a dietary manager, Betty Busby, and she disagreed with his request (*Id.* at 80). Accordingly, the plaintiff informed Hankins that she did not believe she had justification to terminate Busby and, after they discussed the matter further, Hankins agreed with plaintiff and Busby was not terminated (*Id.* at 80-81). Plaintiff testified that both Hankins and Prucetti were supportive of her during her employment at Glenn Haven (*Id.* at 99-100). Plaintiff testified that she did not believe that Estes was supportive of her at Glenn Haven (*Id.* at 95-96).

The defendant returned the plaintiff to the Moundville Facility on or about March of 1992 to serve as its Administrator (*Id.* at 102). Norman Estes, John Hankins and April Prucetti participated in the decision to made this transfer. (*Estes Depo.* at 119-20, 126). When Hankins talked to Madison about going back to Moundville, he did not say there was anything wrong at Glenn Haven or that Madison had done anything wrong at there. (*Madison Depo.* at 100). According to Madison, Hankins told her that she needed to go

5

back to Moundville because Estes had let him (Hankins) down and "things were not going as planned" (*Id.*). Plaintiff did not suffer any decrease in salary or benefits when she was transferred to Moundville (*Id.*).

At the time the plaintiff returned to the Moundville facility, it housed approximately 58 residents (*Id.* at 101). Gina Trapp initially served as her Regional Administrator (*Id.* at 102) but was later succeeded by John Burchfield. (*Id.* at 111).

The plaintiff testified that while she served at Moundville, neither John Burchfield nor Gina Trapp required her to discipline any employee that plaintiff did not want to discipline (*Id.* at 134). She testified that Hankins at one time wanted her to terminate Diane Massey (*Id.* at 137-38). When she informed Hankins that she wanted to work with Massey instead of terminating her, Hankins agreed with that decision (*Id.*). Madison did find when she returned to Moundville that the DON (Peggy) was not very strong, which led to employee call-in and discipline problems (*Id.* at 112-15) and Madison and Hankins terminated her (*Id.* at 115-16). Plaintiff also testified that Debbie Elmore once told her to terminate a DON named Ellie (*Id.* at 116-19). Plaintiff does not dispute that Ellie's performance was unsatisfactory; however, she believes Ellie should not have been terminated because "she did the best that she could" and was planning to quit anyway (*Id.*).

At one point, Madison wanted to talk to Ruth McDuff, the Social Services Director, about her performance. Specifically, Madison wanted to discuss with McDuff the fact that several residents had no eye glasses in three months because they had been broken and McDuff had not gotten them repaired. Also, McDuff had not contacted a family about getting their family member resident some decent clothing because his pants were too small (*Id.*

6

at 141-47). However, Madison alleges she was told by Burchfield that McDuff stated during

a meeting with Elmore that she was upset with Madison. Burchfield also told Madison that

she was not to upset McDuff any further and she did not need to make more problems (*Id.*

at 149-50).

In 1992 Cole and Associates conducted an Employee Opinion Survey at the

Moundville facility (Plaintiff's Ex. 2). According to the 1992 Employee Opinion Survey:

> With one exception, the individuals interviewed seem to be pleased that Ms.
> Madison has come back as Administrator at Moundville. . . . The majority of
> those interviewed made specific comments about since Ms. Madison had
> returned things were "back on track" and that the employee morale is getting
> better. . . . All of the individuals interviewed said they felt free to discuss
> problems with Ms. Madison at any time, and they said she did listen and
> provide assistance. With one exception, Ms. Madison was described as fair
> and caring about the individuals that work for her. Some specific comments
> were made about how hard Ms. Madison was "trying" since she had returned
> and that you could tell a difference in her. In appears that Ms. Madison meets
> with the department heads on a routine basis. Ms. Madison was described
> as a good leader, focused, and she was always there.

(*Id.*) The Summary of Results indicated that "every category score was above the industry

norm score." In the category of "Administrator - The score of 66% was a significant

improvement, 8% above the 1990 survey and it was 12% above norm. The Other Group had

the highest score with a 75% and Nursing had a 68%" (*Id.*). According to the 1992 Employee

Opinion Survey by question category, the Administrator scored 63% in the category of cares

for employees; the Administrator scored 66% in the category of treats employees fairly; the

Administrator scored 67% in the category of is consistent in treatment of employees; and the

Administrator scored 67% in the category of gives an adequate level of guidance (*Id.*).

The defendant alleges that during plaintiff's second period of employment at the Moundville facility, beginning sometime in approximately 1992 or 1993, Northport received numerous complaints from employees, primarily department heads, who worked under the plaintiff's supervision (*Estes Depo.* at 40, 43-44; *Herrmann Depo.* at 29; *Elmore Depo.* at 58, 111; *Burchfield Depo.* at 83-84). At that time, according to the defendant, department heads at the Moundville facility discussed various complaints regarding the plaintiff during meetings with Norman Estes (*Estes Depo.* at 41-43), wherein the department heads generally complained regarding plaintiff's working relationship with them, including feeling threatened and intimidated by plaintiff (*Id.* at 45). After meeting with the department heads, Norman Estes claims he met with plaintiff to go over the employee's complaints and to give the plaintiff suggestions on how to improve her working relationship with these people (*Id.* at 45-46). Madison disputes the quantity of complaints voiced about her, noting the lack of written documentation of the complaints (*Id.* at 83-86).

Northport also contends that following Norman Estes' meetings with the department heads in 1992 or 1993, Burchfield and Elmore began to receive complaints from the facility (*Id.* at 91-93, 98; *Burchfield Depo.* at 71-73) and, accordingly, met with employees to investigate these complaints, met with plaintiff in order to alert her to the complaints, and offered plaintiff suggestions as to how she could improve her relationship with and management of her department heads (*Elmore Depo.* at 80, 83-84, 111, 113-15). Each time Elmore met with employees at the Moundville facility, John Burchfield would allegedly do follow-up with the plaintiff regarding the meetings (*Madison Depo.* at 173). Again, Madison disputes these allegations based on the lack of documented complaints.

8

Madison testified that sometime during 1995, she complained to John Burchfield that she felt he was discriminating against her on the basis of her age by "singling her out" and "picking on her" (*Id.* at 246-48).

In March of 1996, Elmore again met with the department heads at Moundville to discuss complaints she received regarding the plaintiff (*Elmore Depo.* at 115-16). After the meeting, Elmore met with the plaintiff to discuss the issues raised in the department head meeting and to give the plaintiff suggestions as to how to improve her relationship with the department heads (*Madison Depo.* at 153-54; *Elmore Depo.* at 116). Elmore informed the plaintiff that the department heads told Elmore they were upset with plaintiff because she "was always looking over their shoulder;" "treated them like children;" and "would not let them run their own departments" (*Madison Depo.* at 153). Madison explained that she did not think the employees' complaints made against her were the truth and that she had tried to make her department heads like her (*Id.* at 154-55). The plaintiff left the facility following her discussion with Elmore that day, a Friday, and did not report to work the following Monday, March 17, 1996 (*Id.* at 180; *Shultz Depo.* at 51).

On March 17, 1996, Madison began a period of leave that continued until she was released to return to work by her doctor on or about April 18, 1996 (*Madison Depo.* at 180, 195; *Shultz Depo.* at 51). She initially presented the defendant with a doctor's excuse for the period of March 18 through April 1, 1996 (*Madison Depo.* at 188-90, Ex. 2). Ann Shultz, Office Manager, called John Burchfield while plaintiff was on leave to report that the plaintiff had called the facility and during the telephone conversation told Shultz to get her "ass" out of the plaintiff's office and stated that the department heads were nothing but "scum" and

9

she (the plaintiff) did not trust them (*Shultz Depo.* at 56-58; *Elmore Depo.* at 218-19). Madison told Schultz to lock her office and not to let anyone go into her office (*Madison Depo.* at 197).

At the end of the time period reflected in the first doctor's excuse submitted by the plaintiff, John Burchfield asked plaintiff to come to the corporate office and attend a meeting with him and Debbie Elmore on April 2, 1996 (*Id.* at 182-85). During this meeting, John Burchfield and Debbie Elmore discussed with plaintiff the continuing complaints being expressed by department heads and gave plaintiff suggestions as to how to improve her relationship with her department heads including: allowing employees to call her Bertha; toning down her personality; toning down her manner of dress; not taking all the credit for a job well done; not getting upset over minor things; accepting part of the responsibility for employee problems at the facility; and giving department heads an opportunity to complete assigned tasks before repeatedly going to them to see if they had been completed (*Id.*; *Burchfield Depo.* at 82-84, Ex. 2). As to plaintiff's manner of dress, both John Burchfield and Debbie Elmore had talked to her about the issue previously (*Madison Depo.* at 185-86). Plaintiff testified that the requests made by defendant for her to tone down her dress, tone down her jewelry, park in back of the facility, and allegedly drive a pick-up truck, were related to Defendant's alleged desire for other employees at the facility to not know how much money the plaintiff had and/or to know that she made more money than they did (*Id.* at 186-87), although Burchfield testified that no visitors or guests ever complained to him about the manner in which Madison dressed (*Burchfield Depo.* at 121-24).

Following the meeting of April 2, 1996, plaintiff presented a second doctor's excuse dated April 3, 1996, which stated that the plaintiff needed to be away from work (*Madison Depo.* at 189-90, Ex. 2). This second doctor's note did not include a return to work date (*Id.*).

Plaintiff testified that John Burchfield called her at home on April 9, 1996, to talk to her about coming back to work (*Id.* at 190-91). Plaintiff said that she could not come to work because she was still under a doctor's care (*Id.*). Burchfield asked plaintiff to fill out a leave of absence form during a telephone conversation but the plaintiff stated that she did not want to do that because other employees had not been required to do so (*Id.* at 191). Plaintiff informed John Burchfield that she would not return to work until she was released by her doctor (*Id.* at 195).

The plaintiff also asked to meet with Carol Herrmann at the corporate office while she was on leave (*Herrmann Depo.* at 71-72). During this meeting with Herrmann, plaintiff expressed concern that she did not believe that defendant had informed the staff at the nursing home as to the reason she was out of the facility (*Id.* at 72-73). Plaintiff also expressed that she was upset because employees had seen her out shopping while she was on leave and seemed to be holding that against her (*Id.* at 74). During this meeting, Herrmann continued to talk to plaintiff about her management style, the fact that she needed to change her style, and gave her suggestions as to how to improve the management of her department heads (*Madison Depo.* at 174-75; *Herrmann Depo.* at 74, 82).

Plaintiff subsequently returned to work on or about April 18, 1996 (*Madison Depo.* at 195). She admits that she remained on leave until released by her physician and that she was fully compensated throughout her period of leave (*Id.* at 195-97).

Elmore did not have any meetings regarding employee complaints between March of 1996 and June of 1996 (*Id.* at 161). She returned to the facility in June of 1996 to meet with department heads and again talked with the plaintiff following that meeting (*Id.* at 161-62). Elmore informed the plaintiff that the department heads continued to be unhappy with the manner in which the plaintiff managed them and had complained about her being too involved in their departments and about the way the plaintiff talked to them (*Id.*).

According to Northport, due to continued complaints from the facility, Carol Herrmann also met with the department heads to investigate their complaints (*Herrmann Depo.* at 30-32, 80). During this meeting, the department heads revealed to Carol Herrmann that they were frightened of the plaintiff and felt they could not work with her (*Id.* at 29-30). As Northport continued to receive complaints from the department heads, Debbie Elmore again met with them on or about July 8, 1996 (*Madison Depo.* at 165; *Herrmann Depo.* at 134-35). During this meeting, the department heads again discussed the ongoing problems they were experiencing with the plaintiff (*Elmore Depo.* at 152). Madison disputes all of these allegations, at least with regard to the continued complaints, again because of the lack of written documentation of the complaints against her.

Following this meeting, Northport called the plaintiff to the corporate office for a meeting with Carol Herrmann, Debbie Elmore, and John Burchfield on July 9, 1996 (*Madison Depo.* at 163-64; *Elmore Depo.* at 157-58). During that meeting, plaintiff was issued a written

reprimand which warned that the plaintiff had demonstrated: a lack of supervisory skills, a lack of communication skills, a lack of leadership in a team building effort, an inability to create an environment that encouraged positive cooperation among department heads and herself, and a lack of skills in providing positive feedback and day to day training for department staff (*Madison Depo.* at 164, Ex. 1; *Herrmann Depo.*, Ex. 1). The July 9 reprimand stated that the plaintiff must develop positive communication skills with facility staff, work as a team member with department head staff, and develop positive interaction with all staff (*Id.*). The July 9 reprimand also stated that the plaintiff was being placed on a three-month probation (*Id.*). During this meeting, plaintiff was counseled specifically as to the matters referenced in the reprimand and counseled generally as to her continuing inability to get along with department heads (*Madison Depo.* at 165, Ex. 1). Plaintiff was warned that she was not performing as a member of the management team and that she had failed to develop and maintain a good relationship with her department heads (*Id.* at 165). The plaintiff informed the defendant that she had done everything she knew how to do in order to improve the situation and did not know what else she could do. (*Id.* at 166-67). During this meeting, the plaintiff was given the opportunity to resign (*Id.* at 168). She was informed that if she elected to resign, she would receive severance pay, a good reference, and would be given a party (*Id.*). Plaintiff replied that she was not going to resign because she did not feel that she had done anything wrong and that she could correct the problem (*Id.* at 169).

Approximately one week following the July 9, 1996 meeting and reprimand of plaintiff, Elmore claims to have received further complaints from department heads at the facility,

including telephone calls made to her home (*Elmore Depo.* at 174, Ex. 2). Elmore allegedly received telephone calls at home on or about July 16, 1996, from Martha McDaniel, DON, and Ann Shultz, Office Manager, regarding complaints as to the plaintiff's behavior toward department heads (*Id.* at 55, 65, 69-70, 75, 85; *Shultz Depo.* at 95-99). Plaintiff disputes these allegations, based again on lack of written documentation. When Shultz telephoned Elmore at home, Elmore sensed that Shultz was crying (*Elmore Depo.* at 69-70).

When Elmore returned to the office the next morning on or about July 17, 1996, she received a call from Diane Massey, the facility Activities Director, who also complained about the plaintiff's treatment of employees (*Id.* at 74). After receiving these telephone calls at home and at the office, Elmore contacted Dorothy Didway, Dietary Manager, at the facility by telephone to further investigate plaintiff's efforts to improve her relationship with department heads (*Id.* at 78-79). Didway expressed concerns to Elmore that the plaintiff had a problem and that despite Didway's efforts to work with her, things weren't improving (*Id.* at 78-79, 83-84).

Elmore subsequently went to Herrmann to express her concern regarding these telephone calls and the plaintiff's continued demonstrated inability or unwillingness to improve her relationship with her department heads and effectively manage those personnel (*Id.* at 55; *Herrmann Depo.* at 55-56). Carol Herrmann called Ann Shultz to discuss her telephone call to Debbie Elmore's home and asked her to recount her complaints as to the plaintiff's behavior (*Herrmann Depo.* at 118). Elmore and Herrmann then consulted Norman Estes (*Estes Depo.* at 32-34). Elmore, Herrmann and Estes discussed the situation and contacted John Burchfield by telephone (*Id.* at 33; *Elmore Depo.*

14

at 54). Estes, Herrmann, Burchfield and Elmore never asked Madison about the alleged

incident with Schultz before Madison was terminated (*Herrmann Depo.* at 123; *Estes Depo.*

at 37, 132-34; *Elmore Depo.* at 58); in fact, Madison did not know that Schultz was upset with

her (*Madison Depo.* at 257). During her deposition, Herrmann admitted that she never got

Madison's side of the story (*Herrmann Depo.* at 123).

On July 17, Elmore and Herrmann informed plaintiff that she would be immediately

terminated. (*Madison Depo.* at 256; *Herrmann Depo.* at 125).This decision was made by

Norman Estes, Carol Herrmann, Debbie Elmore and John Burchfield (*Estes Depo.* at 32-33;

*Herrmann Depo.* at 103; *Elmore Depo.* at 53). During the meeting in which Madison was

terminated, Elmore told Madison she was "just prolonging the inevitable" (*Madison Depo.*

at 257). The individuals involved in the decision to discharge the plaintiff claim that in light

of the ongoing history of complaints from the plaintiff's subordinates, the plaintiff's long-

standing inability or unwillingness to effectively manage her subordinates following

numerous efforts by all four individuals to assist plaintiff with improving her management

style and written discipline, a decision was made to immediately terminate the plaintiff's

employment (*Estes Depo.* at 31-34, 40, 67, 126-27, 131; *Herrmann Depo.* at 29, 63-64, 81, 118-

23; *Elmore Depo.* at 52, 58-62, 153, 161; *Burchfield Depo.* at 80, 83-84, 93). In addition, the

defendants allege that they were concerned that Northport was going to lose talented

department heads unless the situation with the plaintiff was corrected (*Estes Depo.* at 67;

*Herrmann Depo.* at 116; *Elmore Depo.* at 161). According to Herrmann, Northport also

feared that the plaintiff's inability to develop a good working relationship with the

department heads, including her failure to communicate with the department heads, could

15

inhibit department heads from bringing problems in the facility to her attention (*Herrmann Depo.* at 63-64). Northport was allegedly concerned that the successful operation of the facility would break down in the event problems were not brought to the Administrator's attention (*Id.*).

At the time of the plaintiff's termination, Norman Estes served as President of Northport (date of birth 8/8/55); Carol Herrmann served as Senior Vice President (date of birth 4/7/59); Debbie Elmore served as Director of Human Resources (date of birth 6/19/54); and John Burchfield served as the Regional Administrator for the Moundville facility (date of birth 12/26/66) (*Estes Depo.* at 5; *Herrmann Depo.* at 9; *Elmore Depo.* at 7; *Burchfield Depo.* at 17-18; Defendant's Response to Plaintiff's First Interrogatories and Request for Production of Documents, Interrogatory No. 5).

At the time of the plaintiff's termination, her department heads at Moundville included the following: Dorothy Didway, Dietary Manager; Rossetta James, Housekeeping Manager; Diana Massey, Activities Director; Ruth McDuff, Social Services Director; Martha McDaniel, Director of Nursing; Joyce Bunch, Assistant Director of Nursing; and Richard Kent, Maintenance Supervisor (*Madison Depo.* at 106, 108-09, 110, 112). Massey, Schultz, Didway, and McDaniel never filed any formal complaint against Madison (*Elmore Depo.* at 82). Kent never complained to Elmore about Madison (*Id.* at 148).

## II.  Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

16

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

17

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and

18

all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.    Discussion.

A plaintiff who alleges disparate treatment based on gender under Title VII or the ADEA must prove that the defendant acted with a discriminatory purpose.[3] *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984) (race discrimination case). A plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case, *Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied,* 488 U.S. 1004 (1989), and may establish a prima facie case in one of three ways: (1) by presenting direct evidence of discriminatory intent; (2) by meeting the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) by demonstrating through statistics a pattern of discrimination. *See Early v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir. 1990). "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582. In the present case, Madison has presented no direct or statistical evidence of discrimination by the defendant.

---

[3] The Eleventh Circuit has applied the analytical framework for Title VII disparate treatment claims, set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), to ADEA disparate treatment claims. *Grigsby v. Reynolds Metal Co.,* 821 F.2d 590, 594 (11th Cir. 1987).

Therefore, she must establish a prima facie case of discrimination, if at all, through circumstantial evidence.

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[4] "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring it to articulate some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. *Id.* "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987), *cert. denied*, 502 U.S. 1058 (1992).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. In the Eleventh Circuit,

_____

[4]Under this test, the elements of a prima facie case may be modified to fit the circumstances. "The *McDonnell Douglas–Burdine* proof structure 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

summary judgment for the defendant is inappropriate once a plaintiff has established a prima facie case and there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged actions. *Combs v. Plantation Patterns,* 106 F.3d 1519 (11th Cir. 1997); *Howard v. BP Oil Co.,* 32 F.3d 520 (11th Cir. 1994).

To establish a prima facie case of sex or age discrimination, Madison must show that she (1) was a member of a protected class, (2) was subject to adverse employment action, (3) was qualified to do the job, and (4) was replaced by a member outside the protected class. *See McDonnell Douglas,* 411 U.S. at 802; *Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1441 (11th Cir. 1998). The parties do not dispute the first, second, and fourth prong of Madison's prima facie case—Madison is a woman over 40, was subject to termination, and was replaced by two younger men. Instead, the parties direct their attention to the question of whether Madison was qualified to serve as the Administrator of the Moundville Facility. Although the repeated complaints allegedly received about Madison could make her less than desirable for the position, the court believes that her past experience as Administrator was sufficient to establish that she was—for purposes of establishing a prima facie case—at least minimally qualified for the Administrator position at the time she was terminated. One might reasonably infer that, for reasons not apparent from the evidence of record, something about her performance changed to her detriment and that of the people she was appointed to supervise. But the court considers any such inference to go to her actual performance and not to her qualifications for the job.

21

Since Madison has made out a prima facie case, under *McDonnell Douglas* the burden of production shifts to Northport to articulate a legitimate, nondiscriminatory reason for the alleged discriminatory employment action. *Burdine*, 450 U.S. at 254. Northport has easily met this burden by presenting extensive evidence of complaints about the plaintiff from her employees. The evidence shows a history of complaints against the plaintiff dating back to at least 1992, eventually resulting in a period of probation imposed on July 9, 1996 for "lack of supervisory skills, lack of communication skills, lack of leadership, lack of leadership in a team building effort, inability to create an environment that encourages positive cooperation among department heads and herself. Lack of skills in providing positive feedback and day to day training for department staff." *See* Northport Health Services Conference Report (July 9, 1996). Finally, on July 16 and 17, 1996, Elmore received complaints from four different employees of the Moundville facility about Madison's interaction with her department heads. Northport has therefore presented strong evidence of a nondiscriminatory rationale for its decision to terminate Madison's employment.

As noted earlier, once the defendant has articulated a legitimate, nondiscriminatory reason for its actions, the plaintiff may survive the defendant's summary judgment motion by showing that there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged actions. *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997); *Howard v. BP Oil Co.*, 32 F.3d 520 (11th Cir. 1994).

In the present case, the plaintiff has offered no evidence suggesting that Northport was more likely motivated by a discriminatory reason or that Northport's proffered

22

explanation is unworthy of belief. *Carter v. City of Miami,* 870 F.2d 578, 584 (11th Cir. 1989). Madison asserts as evidence of pretext that Northport did not terminate other Northport Administrators who committed similar violations. However, she has not submitted any evidence to suggest that the violations were truly comparable, that they were of similar duration, or even that the other administrators fell outside her protected class.[5/] Madison's claim that Herrmann failed to get her perspective on the July 17, 1998 incident involving Ann Schultz, contrary to Herrmann's normal policy, is entirely inadequate to raise any question of material fact about Northport's motive for terminating Madison—especially in light of the long history of complaints from Madison's employees. Plaintiff's other arguments regarding pretext are unpersuasive. Madison has simply not "produced sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decisions are not believable," *Howard v. BP Oil Co.,* 32 F.3d 520, 536 (11th Cir. 1994), and has therefore failed to meet her burden of "designat[ing] specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). In fact, she has produced no evidence to question the defendant's articulated reason for its actions with regard to her employment. Her counsel's repeated denial of the defendant's asserted undisputed facts concerning complaints by her subordinates based upon a lack of documentation is disingenuous. The plaintiff's duty at this point is to produce evidence to dispute the defendant's claims of employee complaints, if she can do so. It is not sufficient to attack the credibility of the defendant's witnesses. The fact that the plaintiff questions the

---

[5/]To the contrary, it appears that at least two of the administrators Madison complains about are women.

credibility of the defendant's witnesses does not permit this court to do so when considering a motion for summary judgment. If the defendant's employees did not complain about her she could have obtained and presented that evidence from them. She did not do so.

Madison also claims that she was retaliated against for complaining to John Burchfield at some point during 1995 that she was being discriminated against on the basis of her age. In order to make out a prima facie case of retaliatory discharge, the plaintiff must show that (1) she engaged in statutorily protected conduct; (2) Northport took adverse employment action against her; and (3) there was a causal link between the protected expression and the adverse action. *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993); *Lindsey v. Mississippi Research and Dev. Ctr.,* 652 F.2d 488, 491 (5th Cir. Unit A 1981). Once a prima facie case is established, the defendant must articulate some legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that this reason is merely a pretext for discrimination. *Id.* at 804.

In the Eleventh Circuit, "statutorily protected expression" includes, *inter alia,* filing an EEOC charge, 42 U.S.C. § 2000e-3(a), formal and informal complaints to an employer, *Rollins v. State of Fla. Dep't of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989), and written protests, *Smalley v. City of Eatonville,* 640 F.2d 765 (5th Cir. Unit B 1981). Madison's communication to Burchfield, in which she allegedly stated that she felt he was discriminating against her on the basis of her age by "singling her out" and "picking on

24

her," can be construed as an informal complaint; she has therefore established that she engaged in statutorily protected expression. Because she was terminated by Northport, she has also established that she suffered an adverse employment action.

The third prong of a prima facie case of retaliation—a causal connection between the protected activity and the adverse employment action— has been defined broadly by the Eleventh Circuit. A plaintiff need only establish that "the protected activity and the adverse action were not wholly unrelated." *Goldsmith,* 996 F.2d at 1163 (citing *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993); *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S. Ct. 385, 88 L. Ed. 2d 338 (1985). Even under this liberal standard, however, the facts for summary judgment purposes do not establish a causal connection between her protected activity and her termination. Madison's single comment to Burchfield was made sometime in 1995, six months to a year and a half before her termination. Furthermore, the complaints against Madison and the disciplinary meetings that followed began long before Madison's comment; and there is absolutely no evidence that the statement to Burchfield had any effect whatsoever on the defendant's treatment of Madison. The plaintiff's conclusory statements to the contrary are unavailing. Absent the required causation element, Madison has failed to establish a prima facie case of retaliation.

**IV.    Conclusion**

For the foregoing reasons, the defendant's motion for summary judgment will be granted. A separate order, consistent with this opinion, will be entered.

Done, this _30th_ of November, 1998.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

26